Babak Naficy (SBN 177709)
Law Offices of Babak Naficy
890 Monterey St., Ste H,
San Luis Obispo, California 93401
T: (805) 593-0926
E: babaknaficy@naficylaw.com

Mary E. Tatum (SBN 135122)
TATUM LAW, APC
1119 Palm St., Ste C,
San Luis Obispo, CA 93401
T: (805) 257-8090
E: mary@tatumlawapc.com

Attorneys for Plaintiff, Dr. Jacqueline Loew, Ed.D.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

| | |
|---|---|
| DR. JACQUELINE LOEW, Ed.D.;<br><br>Plaintiff,<br><br>v.<br><br>SANTA MARIA JOINT UNION HIGH SCHOOL DISTRICT; ANTONIO GARCIA, individually and in his official capacity; KEVIN PLATT, individually and in his official capacity; DR. KRISTA HERRERA, individually and in her official capacity; YOLANDA ORTIZ, individually and in her official capacity; SALVADOR REYNOSO, individually and in his official capacity; DR. PAUL ROBINSON, individually and in his official capacity; FELICIANO AGUILAR, | Case No.: 2:26-cv-9190<br><br>**COMPLAINT FOR:**<br><br>1. First Amendment Retaliation—42 U.S.C. § 1983;<br>2. Fourteenth Amendment Procedural Due Process—42 U.S.C. § 1983;<br>3. Whistleblower Retaliation—Labor Code § 1102.5;<br>4. School-Employee Whistleblower Retaliation—Education Code §§ 44110–44114; 5. Discrimination—FEHA;<br>6. Retaliation—FEHA;<br>7. Harassment/Hostile Work Environment—FEHA;<br>8. Failure to Prevent—FEHA; |

| | | |
|---|---|---|
| individually and in his official capacity; and DOES 1 through 25, inclusive; | ) | 9. Violation of California Code of Civil Procedure § 335.1—Intentional Infliction of Emotional Distress |
| Defendants. | ) | **DEMAND FOR JURY TRIAL** |

## I. NATURE OF THE ACTION

1. This action arises from retaliation against Dr. Loew, a Latina, Spanish-speaking female public-school administrator, after she reported practices she reasonably believed violated laws protecting students' educational access, disability rights, safety, and freedom from discrimination.

2. After Dr. Loew made internal reports, filed formal complaints, addressed the DISTRICT's governing Board, and made public whistleblower disclosures, Defendants stripped her duties, transferred and isolated her, placed her on leave, declined to reelect her, denied her a meaningful opportunity to answer stigmatizing accusations, issued a post-employment reprimand, and transmitted disputed allegations in credential proceedings.

3. Defendants also treated Dr. Loew more harshly than male administrators, tolerated demeaning and gender-coded treatment, and failed to prevent discrimination, retaliation, and a hostile work environment.

4. The DISTRICT's Board considered specific complaints or charges concerning Dr. Loew in closed session without the notice and opportunity required by

the Ralph M. Brown Act and failed to cure and correct the challenged action.

5. As set forth more fully below, DR. LOEW, through this action, among other things, seeks statutory and compensatory damages arising out of Defendants' numerous constitutional and statutory violations.

## II. PARTIES

6. Plaintiff DR. LOEW is an experienced educator and educational leader who holds a doctorate in educational leadership, a master's degree in English, classroom-teaching experience, with vast experience serving students in traditional, alternative, and dual-enrollment settings. Proficient in Spanish, DR. LOEW was the only Spanish-speaking Latina administrator assigned to the leadership team at Pioneer Valley High School ("PVHS") during the relevant period.

7. Defendant SANTA MARIA JOINT UNION HIGH SCHOOL DISTRICT serves a student population that is predominantly Latino and includes substantial numbers of English learners, economically disadvantaged students, students with disabilities, and students affected by disciplinary and attendance barriers. At all times relevant, the DISTRICT served as the employer of Plaintiff, Dr. LOEW.

8. The individual Defendants are sued in their individual capacities for damages under 42 U.S.C. § 1983 and, to the extent permitted by law, in their official capacities for prospective relief. The DISTRICT is liable under section 1983 for

decisions and ratification by its governing Board and final policymakers.[1.1]

9. Defendant ANTONIO GARCIA, at all times relevant, served as the superintendent of SANTA MARIA JOINT UNION HIGH SCHOOL DISTRICT, a public entity.

10. Defendants KEVIN PLATT, KRISTA HERRERA, and YOLANDA ORTIZ at all times relevant served as assistant superintendents to ANTONIO GARCIA in their official capacities to the superintendent of SANTA MARIA JOINT UNION HIGH SCHOOL DISTRICT.

11. Defendant DR. PAUL ROBINSON, at all times relevant, served as a school administrator of SANTA MARIA JOINT UNION HIGH SCHOOL DISTRICT, a public entity.

12. The true names and capacities of Defendants named herein as DOES 1 through 25, inclusive, are unknown to Plaintiff who therefore sues such defendants by such fictitious names pursuant to Code of Civil Procedure § 474. Plaintiff is informed and believes that the DOE defendants are California residents. Plaintiff will seek leave of Court to amend this Complaint to allege their true names and capacities when they have been ascertained. Each of the defendants designated herein as a DOE is responsible in some manner for the events and happenings herein alleged and Plaintiff's damages as herein alleged were proximately caused by those Defendants. At all times herein mentioned, Defendants DOES 1 through 25, inclusive, were the

agents, servants, or employees of their co-defendants, and in doing the things hereinafter alleged, were acting within the course and scope of their authority as those agents, servants, or employees, and with the permission and consent of their co-defendants.

13. Plaintiff is informed and believes, and based thereon alleges, that at all relevant times each of the Defendants was the agent of the other Defendants, and in doing the things herein alleged, each Defendant was acting in the course and scope of such agency, with the consent, notification, and permission of each of the other Defendants. Each Defendant ratified the actions of the other Defendants and named employees as alleged herein.

## III. JURISDICTION AND VENUE

14. This court has personal jurisdiction over the defendants because they are residents of and/or doing business in the State of California.

15. Venue is proper in this county in accordance with Section 395(a) of the California Code of Civil Procedure because (a) the defendants, or some of them, reside in Santa Barbara County and (b) the injury occurred in Santa Barbara County.

## IV. COMMON FACTS

16. The DISTRICT hired DR. LOEW as a Dean of Students in July 2024 and assigned her to Pioneer Valley High School ("PVHS").

17. DR. LOEW welcomed this assignment as it gave her an opportunity to

pursue her goals of improving student attendance and educational access, school climate, intervention practices, and equitable treatment of students. DR. LOEW accepted the position intending to build a long-term career in public-school administration and serve the Santa Maria community.

18. PLAINTIFF is informed and believes and on that basis alleges that the DISTRICT hired DR. LOEW because of these same motivations and qualities which it later criticized: analytical, evidence-based, direct, persistent, independently minded, and willing to identify and address problems even if the roots were systemic.

19. As she understood them, DR. LOEW's duties required her to implement lawful disciplinary practices, protect student access to education, respect disability-related protections, and identify practices inconsistent with law or DISTRICT policy. To effectively discharge these duties, DR. LOEW collaborated effectively with school administrators and employees.

20. DR. LOEW participated in attendance and intervention work, school-improvement planning, student-support processes, curriculum-related matters, and other substantive administrative functions. She developed or supported systems intended to improve attendance, identify barriers preventing students from reaching class, and connect students with interventions rather than simply exclude them from school.

21. Initially, DR. LOEW's excellent job performance was acknowledged

and rewarded. DR. LOEW helped resolve a disagreement involving another administrator, demonstrating her commitment to collaboration, conflict resolution, and effective participation in the administrative team. DISTRICT personnel praised aspects of her work, and she received positive feedback concerning the quality and substance of the work she performed.

22. Unfortunately, things changed after PAUL ROBINSON assumed leadership responsibilities at PVHS in or around September 2024, as acting principal. As set forth below, after DR. LOEW began noticing and reporting concerns involving ROBINSON, the DISTRICT began accusing her of dishonesty, privacy violations, refusal to cooperate, unethical conduct, or professional unfitness.

**ROBINSON's Assumption of Authority**

23. Upon taking authority at PVHS, ROBINSON almost immediately began questioning DR. LOEW's authority, experience, and efforts to implement research-based systems.

24. For example, he referred to her in diminutive, unprofessional, and disrespectful terms, including "Miss Jackie," and characterized her as a "newbie" or "just a dean." These statements were intended to publicly diminish DR. LOEW's professional standing and undermine her authority.

25. ROBINSON consistently undermined any reforms or changes proposed by DR. LOEW as they related to attendance, educational access, student intervention,

or legal compliance. These included expressing unfounded and baseless skepticism about the effectiveness or the need for these proposals.

26. ROBINSON frequently criticized DR. LOEW's handling of student and personnel matters arising in the context of her reporting noncompliance with DISTRICT policy and state law. However, other DISTRICT personnel, including Human Resources personnel, subsequently privately indicated that DR. LOEW had handled the matters appropriately.

27. DR. LOEW identified and questioned practices she reasonably believed were unlawful or harmful to students, but ROBINSON often disagreed and increasingly treated these disagreements as challenges to his supervisory authority. ROBINSON became increasingly critical of her judgment, communications, and role as an educator and educational leader.

28. ROBINSON saw and treated these disagreements and DR. LOEW's advocacy as professional shortcomings in DR. LOEW, but disregarded comparable conduct or even more serious disagreements and conflicts, or treated them as coachable when committed by ROBINSON or other administrators.

**DR. LOEW Reports Concerns Affecting Students**

29. Between September and November 2024, DR. LOEW made a series of good-faith internal reports concerning practices she reasonably believed violated student rights, DISTRICT policy, or California law. These reports concerned student

access to education, discipline of students with disabilities, bathroom access, discriminatory or unequal treatment, student safety, workplace intimidation, and the DISTRICT's response to those concerns.

Educational Access and Exclusion

30. DR. LOEW objected to practices that removed or threatened to remove students from instruction for tardiness, refusal to enter class, or other attendance-related behavior without first exhausting appropriate interventions. She objected to such practices that prevented them from attending class as such practices often worsened chronic absenteeism and resulted in denial of educational access to students who most needed support.

31. In particular, DR. LOEW raised serious concerns about the treatment of a student involved in the juvenile-justice system and advocated for intervention, support, and lawful educational access rather than exclusion.

32. She also raised concerns about discipline and other practices directed at and affecting students who were already disengaged from school, traumatized, economically disadvantaged, or otherwise at high risk of dropping out.

33. DR. LOEW argued that student behavior should be addressed in a manner that preserves and encourages students' educational access, particularly those who are disadvantaged and are already at risk of dropping out, to the maximum extent possible.

**Students with Disabilities**

34. DR. LOEW reported concerns about disciplinary decisions involving students with individualized education programs, behavior-intervention plans, or other disability-related protections. She was concerned by ROBINSON's direction on disciplinary actions that failed to adequately account for and acknowledge disability-related behavior, procedural requirements, or limitations on exclusionary discipline.

35. DR. LOEW raised concerns when ROBINSON's actions and arguments demonstrated unfamiliarity or disregard of the range of restrictions governing discipline of students with disabilities.

36. The DISTRICT's later investigation validated DR. LOEW's concerns as the investigation confirmed that ROBINSON had at times been warned about legal limitations that apply to disciplinary actions that can be taken against students with disabilities.

37. The DISTRICT nevertheless treated ROBINSON's lack of knowledge and understanding in this regard not as evidence of misconduct or professional unfitness, but merely an occasion for "coaching."

38. In contrast to the approach taken with respect to ROBINSON, the DISTRICT did not praise or reward DR. LOEW's efforts to bring these issues to light and instead unfairly treated her reporting of these issues as evidence that she lacked judgment or could not work effectively with others.

**Bathroom Access**

39. DR. LOEW reported concerns about restrictions that PVHS had placed on student access to the bathroom. She believed the restrictions could affect student health, dignity, menstruating students, and students with disabilities or medical needs.

40. The DISTRICT's investigation later confirmed that ROBINSON had severely restricted bathroom access, although it concluded that his actions did not warrant corrective relief even though the DISTRICT's investigation confirmed that DR. LOEW's original concerns about restrictions on student access to bathrooms were valid.

**Race and Unequal Treatment**

41. DR. LOEW also raised concerns about the treatment of Black students and whether certain students were being grouped, watched, or disciplined based on assumptions rather than individualized conduct.

42. The DISTRICT's investigation did not sustain her allegation that ROBINSON intentionally targeted two Black students because of race. It nevertheless confirmed that administrators had discussed the need to "check our bias" and avoid treating the two students as a unit rather than as individuals, showing that there was an underlying pattern of discriminatory behavior towards students based on race.

43. Other incidents and instances also pointed to underlying racial bias. At

an October 2024 school event, ROBINSON commented in substance that it was good for PVHS students to "finally experience some class." DR. LOEW reasonably interpreted this statement as reflecting a disparaging view of the predominantly Latino and working-class community served by PVHS.

44. On or about October 21, 2024, ROBINSON stopped a Latino student from attending class because the student was wearing a hairnet. ROBINSON directed DR. LOEW to impose dress-code discipline, which in context meant she was being asked to ban hairnets, which are commonly worn by Latino students. DR. LOEW is not aware of any rules or regulations prohibiting hairnets and therefore reasonably believed the prohibition of hairnets and other similar attire amounted to race-based discrimination involving hair and cultural expression in violation of the CROWN Act.

45. On this basis, DR. LOEW refused to punish or discipline the otherwise high-achieving student, documented her objection, and returned the student to instruction.

46. DR. LOEW also reported other instances in which she believed a student's race, disability, class, justice-system involvement, or perceived behavioral status influenced how students were treated by the DISTRICT and ROBINSON.

47. Her reports reflected a good-faith effort to identify and request review of patterns of discriminatory and otherwise unlawful conduct, while acknowledging that

at times the DISTRICT disagreed with her interpretation of particular incidents.

**Justice-Involved Students**

48. DR. LOEW raised concerns regarding the treatment of a student who had returned to PVHS following juvenile detention and who also had an individualized education program.

49. This was in response to incidents when ROBINSON confronted a student and threatened the student with criminal charges after the student spat on the ground. ROBINSON knew the student was on probation and the threat of further criminal charges amounted to a serious threat.

50. When the student became distraught and dysregulated because of the threat, ROBINSON directed that the student be sent home or excluded from class. Because the student's parents could not leave work to come to school, the student was restricted to an isolated classroom for the entire day because of a relatively minor incident.

51. DR. LOEW reported this incident because she reasonably believed ROBINSON had unnecessarily escalated a vulnerable student rather than using trauma-informed and disability-responsive interventions.

**Student Safety and Sexual-Misconduct Reports**

52. DR. LOEW also raised concerns about ROBINSON's responses to student sexual-assault and safety matters.

53. During one discussion of sexual misconduct and student safety, ROBINSON stated in substance that adolescent boys primarily wanted sex and that girls often derived their self-worth from the way they responded to sexual advances by boys. These statements are inconsistent with a trauma-informed response to students reporting sexual misconduct.

54. DR. LOEW disclosed during the discussion that she was a survivor of sexual abuse and assault and indicated that ROBINSON did not understand the female perspective. ROBINSON thereafter accused DR. LOEW of mishandling the student matter and suggested that administrators had been terminated for less because she did not submit a Child Protective Services report against a teenage student.

55. DR. LOEW consulted Human Resources, another administrator, and a social worker, each of whom advised her that she had handled the matter appropriately.

56. ROBINSON separately criticized DR. LOEW for attending a lengthy meeting with parents who were reporting a sexual assault because she was unavailable to respond to an unrelated lunchtime disturbance.

57. These incidents show that ROBINSON's criticism directed to DR. LOEW involved circumstances where she prioritized student safety and complied with her professional responsibilities to handle these sensitive topics.

Safety and Workplace Intimidation

58. In October 2024, DR. LOEW reported conduct she perceived as a workplace threat or intimidation by ROBINSON against DR. LOEW. Based on the initial response from DISTRICT personnel, DR. LOEW concluded that her concern had been dismissed and/or disbelieved despite having the testimony of a credible witness.

59. A DISTRICT investigation acknowledged that the initial response could reasonably have communicated disbelief, although it did not sustain DR. LOEW's broader allegation.

The DISTRICT Had Repeated Notice of DR. LOEW's Protected Activity.

60. Despite the DISTRICT's inappropriate and unprofessional response to her reports and complaints, DR. LOEW continued to use appropriate internal reporting channels rather than simply disregarding or ignoring these types of issues.

61. DR. LOEW continued to communicate with ROBINSON, other site administrators, Human Resources personnel, cabinet-level officials, and Superintendent ANTONIO GARCIA.

62. She requested guidance, clarification, facilitated discussion, investigation, and corrective action. During an approximately six-week period in fall 2024, DR. LOEW documented approximately eleven reports involving ROBINSON, student rights, safety, discrimination, retaliation, or legal compliance. These reports were based on events she personally observed, communications she had received,

DISTRICT records available to her based on her job duties, and concerns reported by students, parents, employees, or other administrators.

63. The DISTRICT's subsequent investigation essentially validated these reports to the extent that the DISTRICT did not find that any of them were dishonest or had been fabricated or made in bad faith. Rather, the investigator repeatedly acknowledged that DR. LOEW had sincerely believed the conduct she reported was improper.

**Complaints Against DR. LOEW**

64. Some complaints had been lodged against DR. LOEW; however, ROBINSON never provided her with the underlying complaints or sufficient information to permit a meaningful response.

65. DR. LOEW requested access to these complaints because ROBINSON criticized her performance on the basis of some of these complaints. The DISTRICT did not provide DR. LOEW with a fair opportunity to review and answer all accusations being used against her.

66. Some matters attributed to DR. LOEW involved conditions predating her assignment, actions attributable to others, or concerns that the allegedly complaining employee later clarified were not directed at her.

67. On or about September 29, 2024, DR. LOEW submitted a written complaint concerning ROBINSON's conduct and her working conditions.

68. Human Resources arranged a meeting to try to resolve these conflicts. DR. LOEW participated in good faith.

69. The process did not address all matters she had raised. To make matters worse, ROBINSON brought up new accusations against her without providing the supporting complaints.

70. DISTRICT personnel acknowledged that DR. LOEW had been subjected to intrusive, excessive observation and/or supervision and that her workload was not reasonably balanced.

71. Although the most intensive and intrusive observation stopped, the DISTRICT did not adequately address the broader retaliation she reported.

72. On November 11, 2024, DR. LOEW submitted a formal Uniform Complaint Procedure in accordance with DISTRICT policy and Education Code, and an employment complaint. The complaint described DR. LOEW's sincere belief that students were being denied educational access, disability protections, equal treatment, and safe or appropriate intervention, as well as her involuntary demotion and new work environment.

73. The Complaint also put the DISTRICT on notice that DR. LOEW was experiencing retaliation, discrimination, intimidation, diminished duties, and professional isolation because she had raised those concerns.

74. GARCIA acknowledged receipt of the complaint on November 12,

2024. By then, the DISTRICT had actual notice of both the student-related concerns and the alleged retaliation against DR. LOEW.

**Reduction of Duties and Involuntary Transfer**

75. As DR. LOEW did not stop documenting instances of violations of DISTRICT policy and law, ROBINSON removed or reassigned significant portions of her substantive responsibilities. These included relieving her of duties related to attendance and intervention systems, curriculum or school-improvement functions, accreditation-related work, student-support processes, and other duties that had allowed her to exercise administrative leadership. These were some of the same areas that were frequently the subject of her concerns and formal complaints.

76. DR. LOEW's remaining substantive responsibilities became increasingly more limited. DR. LOEW believes and on that basis alleges that these changes, which amounted to stripping away some of her most important professional responsibilities, were retaliatory in nature.

77. On or about November 5, 2024, the DISTRICT involuntarily transferred DR. LOEW from PVHS to the Multilingual and Migrant Educational Program referred to as "MMEP." The transfer removed her from the students, employees, programs, and school-improvement work for which she had been hired.

78. The DISTRICT claimed the transfer was intended to meet an operational need and was not considered an adverse action or a demotion. The DISTRICT later

asserted to the Civil Rights Department that the transfer was the result of the MMEP Director's bereavement leave. However, DR. LOEW believes this explanation is false in part because the MMEP Director's leave unexpectedly began after DR. LOEW was abruptly removed from PVHS.

79. The DISTRICT's investigator found that the Cabinet, including GARCIA, participated in and supported the transfer. The investigator also found that no one discussed obtaining prior Board approval for the transfer and expressly declined to determine whether such approval was legally required.

80. After the transfer, the DISTRICT did not provide DR. LOEW with a substantively comparable administrative workload. She was placed in a physically and professionally isolated location with few meaningful duties, often sitting for hours, and in some cases days, without any tasks or assignments to complete.

81. DR. LOEW repeatedly advised DISTRICT administrators that she was ready and willing to perform productive work. She requested substantive duties reasonably consistent with her qualifications and administrative position. She also requested to return to PVHS or to be given meaningful work at another location.

82. Superintendent GARCIA told DR. LOEW that she would not be permitted to return to PVHS because of the investigation that started as a result of her formal UCP complaint.

83. The DISTRICT's later findings confirmed that GARCIA had refused to

allow her to return during the investigation, while concluding that the decision did not warrant relief.

84. DR. LOEW remained isolated even though the DISTRICT continued to pay her and had not formally disciplined her. The reassignment deprived her of a chance to continue to grow in a professional capacity, including by depriving her of the ability to exercise administrative judgment, maintain professional relationships, demonstrate competence, and complete practical components of her administrative credential program.

85. Accordingly, DR. LOEW is informed and believes and on that basis alleges that the transfer functioned as punishment despite the DISTRICT's characterization of it as nonpunitive.

**The DISTRICT Receives Notice of Serious Medical Harm**

86. The reduction of duties, involuntary transfer, professional isolation, and continuing uncertainty caused DR. LOEW significant emotional distress. Her symptoms included sadness, anxiety, humiliation, loss of professional identity, difficulty functioning, and depression.

87. DR. LOEW informed DISTRICT officials that the assignment and absence of meaningful work were harming her health on November 20, 2024.

88. On December 19, 2024, she advised GARCIA in writing that she had been diagnosed with clinical depression and that her doctor recommended medical

leave because her condition was deteriorating. She explained that she had previously received positive feedback about the quality of her work but DISTRICT personnel had told her that her sadness was apparent and that she needed to appear happy so others would speak positively about her.

89. DR. LOEW informed GARCIA that her work situation had not improved after she reported its effect on her health and that her medication had again been increased. She provided a medical note and requested a workers' compensation claim form.

90. GARCIA acknowledged her email and forwarded the materials to Human Resources. The DISTRICT therefore had actual notice that the ongoing conditions were causing medically documented harm. The DISTRICT did not restore her to meaningful duties, return her to PVHS, or otherwise correct the conditions she identified as contributing to her depression and emotional distress.

**The DISTRICT's Investigation of DR. LOEW's Complaints**

91. The DISTRICT's retained attorney Kathryn Eppright to investigate DR. LOEW's complaints against Robinson, Krista Herrera, Kevin Platt, Reynoso, and later GARCIA.

92. DR. LOEW fully cooperated with the investigation, supplied documents, identified witnesses, provided a detailed narrative chronology of the events underlying her complaints, and participated in six hours of interviews.

93. The investigation ostensibly concerned complaints made by DR. LOEW against DISTRICT officials. It was not presented as a disciplinary investigation in which DR. LOEW was formally charged with misconduct.

94. On January 9, 2025, the DISTRICT's contracted investigator Kathryn Eppright contacted DR. LOEW to inform her that the investigation would not be complete by the 60-day deadline established in DISTRICT policy and Education Code because she was not able to begin due to her father's illness, and requested an extension.

95. DR. LOEW stated that she did not seem to have a choice in the matter and that she would cooperate with the investigation anyway. Eppright subsequently requested three additional extensions, with each of which DR. LOEW had little choice but to cooperate.

96. On February 26, 2025, nearly six weeks late, the DISTRICT issued findings concerning DR. LOEW's complaints. These findings did not sustain most of DR. LOEW's broader conclusions. They nevertheless confirmed material portions of the circumstances underlying her reports.

97. The DISTRICT report confirmed that Robinson had restricted student bathroom access. It acknowledged that Robinson sometimes required correction or guidance concerning legal restrictions applicable to students with disabilities. It confirmed that DR. LOEW was justified in her concerns about racial bias because the

administrators had openly discussed a specific need to avoid bias when considering two Black students together rather than individually. It acknowledged the initial response to DR. LOEW's workplace-safety report could reasonably have been interpreted as communicating disbelief in the truth of her allegations and concerns. It confirmed that GARCIA participated in and supported DR. LOEW's transfer and refused to return her to PVHS while the investigation remained pending. The findings repeatedly confirmed that DR. LOEW sincerely believed the conduct she reported was improper.

98. The findings recognized and acknowledged DR. LOEW's intelligence, confidence, style, persistence, sensitivity to criticism, and asserted reluctance to accept competing perspectives.

99. The DISTRICT did not seriously address ROBINSON's incomplete understanding of legal restrictions on treatment of students with disabilities and instead recommended that his shortcomings be resolved through guidance.

100. Whereas the DISTRICT treated DR. LOEW's reporting of these issues as evidence of interpersonal or professional deficiency for which she was punished, it did not impose comparable employment or credential consequences on ROBINSON.

101. The DISTRICT did not restore DR. LOEW to her duties, did not return her to PVHS, and continued to isolate her despite the documented health consequences. The DISTRICT thereby failed to protect the at-risk students whose

rights DR. LOEW attempted to protect, and instead retaliated against her for attempting to protect them.

**DR. LOEW Exhausts Internal Channels and Engages in Protected Whistleblower Activity**

102. By January 2025, DR. LOEW had spent months attempting to obtain an effective internal response. She had reported concerns to site administrators, Human Resources, cabinet officials, the Superintendent, and the outside investigator. She had participated in facilitated discussions, submitted written complaints, cooperated with the investigation, requested meaningful work, and reported medically documented harm.

103. Yet, the DISTRICT had not restored her duties, ended her isolation, provided corrective action she believed adequate to protect students, or completed the investigation in accordance with the statutory deadline.

104. In approximately December 2024, DR. LOEW prepared a document entitled “Timeline and Documentation” to chronicle and describe the events underlying her complaints that was the basis for the DISTRICT-authorized investigation. This document described events DR. LOEW had witnessed, and the administrative actions forming the basis of her complaints. The document referred to materials that were maintained separately in access-restricted locations that could not be accessed without specific password-protected authorization/access.

105. The outside investigator later confirmed through a text exchange that the links could not be accessed without separate authorization.

106. On January 16, 2025, DR. LOEW privately contacted San Luis Coastal Unified School DISTRICT Superintendent Dr. Eric Prater to request professional guidance and mentorship after he privately stated he was interested in helping her with her personal circumstances the night before.

107. She sought this guidance because she felt isolated and believed students were being harmed, internal processes had failed to produce an effective remedy, and she was preparing to address the DISTRICT's governing Board.

108. DR. LOEW sent the communication from her personal email account to Dr. Prater. She did not send the "Timeline and Documentation" communication to her husband from her DISTRICT email account as the DISTRICT now claims.

109. The restricted materials referenced in the timeline remained locked and were not accessible merely because a recipient possessed the narrative or could see a link.

110. Dr. Eric Prater then responded to DR. LOEW stating that he could not help her because he was friends with GARCIA, despite knowing she worked for GARCIA when they spoke privately the night before.

111. On January 21, 2025, DR. LOEW spoke during public comment at a regular Board meeting. She addressed student welfare, discrimination, disability

protections, educational access, retaliation, administrative accountability, and the DISTRICT's response to her reports.

112. DR. LOEW also transmitted a written whistleblower disclosure to a broad group of DISTRICT employee email addresses. The disclosure contained DR. LOEW's narrative account and redacted emails. It did not include any unredacted student records as later claimed by the DISTRICT.

113. Some of the redacted documents were inadvertently associated with the account attributed to DR. LOEW's husband because they were created while the account was logged into the household browser during her efforts to redact identifying information. Significantly, however, DR. LOEW did not intentionally transmit protected student records to her husband. In fact, he never accessed any protected student records.

114. DR. LOEW reasonably believed these disclosures were necessary because she had exhausted internal channels and because remaining silent could allow harm to students to continue. She did not intend to expose private student information or cause harm to any student, nor was any such harm reported.

115. On January 22, 2025, DR. LOEW informed the outside investigator that she had submitted an additional complaint concerning GARCIA. The DISTRICT directed the investigator to expand the investigation to address DR. LOEW's complaint against GARCIA. The complaint and COC response document the separate

contexts of these communications and DR. LOEW's consistent denial of public dissemination of student records.

DISTRICT Conducts Closed Session and Places DR. LOEW on Administrative Leave

116. On January 24, 2025, three days after DR. LOEW's public Board remarks and employee disclosure, the Board held a special meeting which included a closed-session personnel item.

117. DR. LOEW did not receive, at least 24 hours before the closed session, written notice that specific complaints or charges against her would be considered and that she could request that they be heard in open session. She was never provided with any information about what took place at this closed session meeting. DR. LOEW is informed and believes and, on that basis, alleges that the DISTRICT BOARD considered specific charges against her and took a decision to place her on punitive administrative leave on the basis of these charges.

118. DR. LOEW filed a Petition for Writ of Mandate in Santa Barbara County Superior Court challenging the DISTRICT's failure to notify her of the charges against her that she believes were the basis for the DISTRICT's decision to place her on leave. The Petition is currently pending.

119. On January 27, 2025, Board President Feliciano Aguilar sent DR. LOEW a letter stating that she was being placed on administrative leave due to

specific charges or complaints concerning her disclosures to the Board.

120. A separate January 27 letter from Assistant Superintendent Yolanda Ortiz accused DR. LOEW of unlawfully sharing confidential student information and demanded that she complete a disclosure log.

121. The DISTRICT placed DR. LOEW on paid administrative leave that same day. The DISTRICT thereby removed her completely from the workplace and prohibited her from performing DISTRICT duties, speaking to any DISTRICT employee, or being on any DISTRICT property.

122. This occurred just six days after her public comments and whistleblower disclosure and five days after the investigator received her complaint against Garcia.

123. Before removing DR. LOEW, the DISTRICT did not provide her with all of the evidence on which the DISTRICT has accused her of disclosing confidential student information. The DISTRICT, moreover, did not identify with specificity every document allegedly disclosed, every unauthorized recipient, whether any recipient accessed the material, or the technical evidence connecting DR. LOEW to any alleged public disclosure of confidential student information.

124. DR. LOEW was never afforded an evidentiary hearing before a neutral decision-maker. She was not permitted to question witnesses, examine the DISTRICT's evidence, or provide an explanation as to the purpose of the disclosures, their intended audience, redaction protocols and safety features, and access

restrictions applicable to the communications at issue.

125. The DISTRICT later argued in the Superior Court case currently pending that no charges had been "delivered" to DR. LOEW and that the Board did not consider specific complaints or charges at the January 24 meeting.

126. These assertions conflict with Aguilar's January 27 notice, which stated the specific charges or complaints, and with the DISTRICT's position that the leave was connected to alleged misconduct.

**<u>The Disclosure-Log Demand and DR. LOEW's Denial</u>**

127. The DISTRICT directed DR. LOEW to complete a log identifying confidential information she had allegedly transmitted and every person to whom she had allegedly disclosed it. The demand assumed that the broad disclosure described by the DISTRICT had occurred.

128. DR. LOEW disputed and continues to dispute that premise. On January 29, 2025, she stated: "To my knowledge, I have not circulated any confidential student records to any person in any manner." On this basis, DR. LOEW therefore did not complete the disclosure log in the form demanded. Her response amounted to a contemporaneous and unequivocal denial, not an admission that she had disclosed student records and refused to identify the recipients.

129. The DISTRICT later characterized her failure to complete the log as noncooperation and deficient professional judgment. That characterization failed to

acknowledge her vehement denial that any disclosure did in fact take place, or that the DISTRICT had failed to disclose any evidence substantiating the alleged breach.

**The DISTRICT Develops an Unsupported Disclosure Narrative**

130. After placing DR. LOEW on leave, the DISTRICT asserted that she had disseminated confidential student, employee, and DISTRICT information through emails, Google Drive documents, and later online postings.

131. DR. LOEW denied publicly disclosing confidential student records. She denied uploading documents to LimeWire. She denied posting documents to Reddit. She denied directing another person to make either posting.

132. DR. LOEW again asked for the disclosure of the evidence supporting the DISTRICT's accusations. The DISTRICT did not identify any authenticated technical evidence connecting DR. LOEW or her devices to the LimeWire or Reddit postings. It did not provide account records, IP-address evidence, upload logs, device information, metadata, or a communication in which DR. LOEW instructed another person to post the materials.

133. The DISTRICT instead stated that it "believed" DR. LOEW had posted the materials or provided them to someone acting under her direction.

134. It should be noted that the later online postings of this material occurred in March 2025, after the January 24 closed session, January 27 administrative leave, and commencement of the non-reelection process. Those postings therefore could not

have supplied the original factual basis for the January adverse actions.

135. The DISTRICT nevertheless failed to note this discrepancy when it has leveled charges of improper disclosure as the basis for adverse actions against her.

136. The DISTRICT has also asserted that review of DR. LOEW's DISTRICT email account established that she had sent the "Timeline and Documentation" narrative to her husband.

137. DR. LOEW disputes this assertion because the relevant timeline communication was sent from her personal email to Dr. Eric Prater in confidence and with the request for mentorship and support.

138. The DISTRICT further treated a limited number of redacted Google documents associated with the account attributed to DR. LOEW's husband as proof that he received or accessed protected student records. However, the underlying confidential student materials remained separately restricted. The DISTRICT has not identified any evidence to establish that DR. LOEW's husband accessed those underlying records.

139. The existence of a file, account association, storage location, link, potential access, actual access, and public dissemination are distinct facts requiring distinct evidence. However, the DISTRICT's misconduct narrative about DR. LOEW treated those concepts as interchangeable.

140. As set forth below, the Committee of Credentials ("COC") later repeated

the DISTRICT's descriptions of emails and document contents, but the COC report did not identify the authenticated emails, attachments, access records, or percipient testimony substantiating each material conclusion.

141. Based on the foregoing, DR. LOEW alleges that the DISTRICT adopted and published the disclosure accusation without competent evidence establishing the precise document disclosed, an unauthorized recipient who actually accessed it, or DR. LOEW's authorship or direction of unauthorized disclosures.

**Contemporaneous Responses**

142. DR. LOEW disputed the DISTRICT's allegations immediately. She has repeatedly and contemporaneously denied knowingly disclosing confidential student records and distinguished among the separate documents, communications, and online postings. At all times the DISTRICT has failed to provide competent evidence to substantiate allegations against DR. LOEW, even after specific requests for such evidence.

143. At no time did the DISTRICT provide DR. LOEW an evidentiary hearing, even when she was entitled to such due process under DISTRICT policy and California Government Code.

**Non-Reelection and Denial of Process**

144. While DR. LOEW remained on leave and the disclosure allegations remained unresolved, the DISTRICT initiated the process to non-reelect her from

continued administrative employment.

145. On or about March 11, 2025, the Board voted not to re-elect DR. LOEW.

146. The DISTRICT did not provide a contested evidentiary hearing at which DR. LOEW could examine witnesses, challenge electronic evidence, or obtain neutral findings concerning the disclosure allegations.

147. On February 28, 2025, the DISTRICT directed DR. LOEW to attend a meeting with Assistant Superintendent of Human Resources Kevin Platt and Assistant Superintendent of Business Services Yolanda Ortiz on March 3, 2025.

148. On March 3, 2025, the DISTRICT provided DR. LOEW notice that non-reelection would be recommended to the School Board.

149. In that setting, Defendant PLATT characterized the non-reelection as an action that would have an adverse effect on her future employment opportunities with other districts and offered her an opportunity to resign. DR. LOEW refused to resign.

150. On March 6, 2025, DR. LOEW invoked her constitutional right to speak to the BOARD to answer the accusations affecting her employment and professional reputation and for restorative mediation. As previously requested, she again sought an open proceeding in which she could address the accusations.

151. On March 10, 2025, Superintendent GARCIA responded to DR. LOEW's request stating, "I received your request to engage in 'restorative mediation

with a neutral, professional facilitator.' As you were informed, the DISTRICT is recommending to the Board that you be non-reelected for the 2025–26 school year and will not engage in a mediation at this time."

152. On March 10, 2025, BOARD President Feliciano Aguilar responded to DR. LOEW's request stating, "The Superintendent forwarded me your request to meet in closed session. There are very specific parameters for meeting in closed session, and the Board does not generally meet directly with administrators regarding personnel items. There is no due process right to attend a closed session regarding a non-reelection. You do have the right to address the Board in open session prior to the closed session on March 11, 2025. Regarding your complaint, because you made a complaint about the Superintendent, the Board engaged a third-party investigator to investigate your claims. The Board adopted the findings made by the investigator and provided you with a letter of findings. The Board now considers that matter closed."

153. As stated above, in related ongoing state-court litigation, the DISTRICT has asserted that no charges were delivered to DR. LOEW, that the Board did not consider specific complaints or charges, and that no investigation into her conduct occurred.

154. Yet, the DISTRICT has continued to justify DR. LOEW's placement on administrative leave, reprimand, and credential consequences based on serious

allegations of misconduct which it also claims it has never investigated.

155. These materially inconsistent positions raise substantial constitutional concerns and questions concerning the DISTRICT's process, including questions about the timing of the alleged misconduct allegations, the evidence on which it is based, and whether DR. LOEW was ever given a fair opportunity to address it.

**Resignation and Post-Employment Reprimand**

156. After the non-reelection decision, DR. LOEW remained on administrative leave and continued to wait for reassignment or a new assignment because she hoped to return to work as an educational administrator and to continue to progress with her chosen career.

157. She was told in March 2025 that an assignment was imminent; however, the DISTRICT did not return her to meaningful work.

158. After approximately five months on leave, DR. LOEW had no choice but to obtain other employment to replace her income and preserve health insurance for her family.

159. On June 2, 2025, DR. LOEW resigned shortly before beginning the new position and forfeited compensation because the cost of leaving her family without her income was untenable. The DISTRICT approved her resignation on June 10, 2025.

160. Her resignation was forced on her by dire economic necessity and was

not an admission that the DISTRICT's allegations were true.

161. On or about June 23, 2025, after DR. LOEW submitted her resignation, the DISTRICT issued a written reprimand. The reprimand accused DR. LOEW of dishonesty, poor judgment, privacy violations, refusal to follow directives, failure to cooperate, and failure to meet ethical standards. Those accusations directly implicated her honesty, professional ethics, judgment, trustworthiness, and fitness to serve as an educator.

162. The DISTRICT issued the reprimand without providing DR. LOEW with a prior evidentiary hearing or opportunity to refute said claims.

163. DR. LOEW responded in writing, disputed the allegations, and demanded a retraction.

164. The DISTRICT did not retract the reprimand, refused to provide a neutral name-clearing process, and presented the disputed claims to the COC as findings of fact.

DISTRICT's Publication of Accusations against DR. LOEW and Credential Consequences

165. The DISTRICT reported or caused the reporting of DR. LOEW's employment separation and alleged misconduct to the California Commission on Teacher Credentialing ("CTC"). The DISTRICT's communications claimed that DR. LOEW had disseminated confidential information to unauthorized people and online

platforms, acted dishonestly, and failed to cooperate.

166. These assertions were false or materially misleading because they presented disputed and unsupported allegations as though they had been established through a complete and fair misconduct investigation. No such investigation or adjudication had occurred.

167. In November 2025, the CTC informed DR. LOEW that no adverse action would be taken at that time. On March 3, 2026, the CTC opened or renewed a credential-fitness investigation based principally on allegations supplied by the DISTRICT.

168. DR. LOEW submitted a written response, supporting documents, contemporaneous denials, professional records, and letters of support. She explained that the DISTRICT had conflated distinct communications and later postings, lacked evidence connecting her to the anonymous online activity, and had taken inconsistent positions concerning whether charges or an investigation existed.

169. In July 2026, the Committee of Credentials recommended suspension of DR. LOEW's credentials for 364 days. The recommendation was issued under a preliminary probable-cause process and did not follow a formal evidentiary hearing before an administrative law judge.

170. At that stage, DR. LOEW had not been permitted to subpoena DISTRICT witnesses, compel technical evidence, cross-examine the persons who

reached the DISTRICT's conclusions, or obtain formal credibility findings.

171. The CTC report substantially repeated what the DISTRICT "determined" or "indicated" concerning emails, document contents, and online postings. The report did not identify the non-hearsay evidence substantiating each material conclusion.

172. DR. LOEW fully intends to contest the recommendation through the formal administrative hearing process.

173. No administrative law judge has found that DR. LOEW intentionally disclosed confidential student records, authored or directed the LimeWire or Reddit postings, acted dishonestly, or is unfit to hold an educational credential.

Causation and Pretext

174. DR. LOEW contends that her constitutionally protected reports of misconduct and problems at the DISTRICT preceded and precipitated the DISTRICT's material adverse actions against her.

175. She was stripped of her meaningful responsibilities after she began reporting student-rights and legal-compliance concerns.

176. The DISTRICT then transferred her out of the High School to which she was assigned and isolated her after she filed more formal reports. The DISTRICT maintained the isolation even after receiving notice that it was causing clinical depression and medically documented harm.

177. The DISTRICT's own investigation acknowledged that DR. LOEW was not afforded the proper process for the transfer as it was never presented to, nor approved by a School Board vote as is custom and required by DISTRICT policy and Education Code.

178. Then the DISTRICT placed DR. LOEW on leave six days after her January 21 public whistleblower disclosure and five days after the investigator received her complaint against GARCIA.

179. The DISTRICT decided not to renew her contract solely based on unresolved allegations that had never been adjudicated through a fair or constitutionally adequate evidentiary process.

180. The DISTRICT issued a stigmatizing reprimand based on the same allegations even after she had resigned.

181. It transmitted or reinforced the same accusations in credential proceedings, causing continuing professional harm.

182. The DISTRICT's shifting explanations, unequal treatment, temporal proximity, procedural irregularities, and lack of competent proof for its central disclosure accusations support an inference that its stated reasons were incomplete, pretextual, or developed to justify retaliation already underway.

**Final Policymaker Knowledge and Ratification**

183. The DISTRICT's governing Board constituted or possessed authority

attributable to the DISTRICT with respect to the employment decisions alleged herein, including decisions concerning Plaintiff's administrative leave, non-reelection, and responses to Plaintiff's requests to address the accusations against her.

184. The Board received notice of Plaintiff's complaints concerning student rights, discrimination, retaliation, workplace intimidation, and the conduct of senior DISTRICT administrators, including Superintendent Garcia.

185. The Board reviewed or adopted findings from the outside investigation concerning Plaintiff's complaints and therefore possessed knowledge of the circumstances surrounding Plaintiff's protected activity and the DISTRICT's response to that activity.

186. The Board thereafter participated in, approved, authorized, or ratified material employment actions affecting Plaintiff, including her administrative leave and non-reelection.

187. Plaintiff also requested an opportunity to address accusations affecting her employment and professional reputation. The Board, through its President and other authorized representatives, declined to provide the process Plaintiff requested while permitting adverse action based upon or associated with serious allegations of misconduct.

188. Plaintiff is informed and believes, and on that basis alleges, that the governing Board possessed actual knowledge of the material circumstances

surrounding Plaintiff's protected speech and the adverse actions taken against her and nevertheless approved, ratified, or failed to correct those actions.

189. To the extent the constitutional violations alleged herein resulted from decisions made by officials possessing final policymaking authority, or from decisions knowingly ratified by such officials, Plaintiff alleges that the DISTRICT is responsible for those constitutional violations under 42 U.S.C. § 1983 to the extent permitted by law.

190. Moreover, GARCIA, ORTIZ, HERRERA, REYNOSO, and PLATT personally participated in and supported the involuntary transfer and refused to return DR. LOEW to PVHS.

**Damages and Continuing Harm**

191. As a direct, foreseeable, and proximate result of Defendants' conduct, DR. LOEW lost her DISTRICT administrative position and the career advancement associated with it. She was removed from her administrative credential program.

192. DR. LOEW has suffered lost earnings, lost benefits, diminished earning capacity, and loss of professional opportunities. She suffered clinical depression, anxiety, humiliation, grief, emotional distress, and loss of professional identity. She incurred medical expenses, legal expenses, administrative-defense costs, and other consequential losses.

193. The DISTRICT's accusations stigmatized DR. LOEW as dishonest,

unethical, unsafe with confidential information, and professionally unfit. These accusations have impaired her ability to obtain comparable employment in education and exposed her state-issued credentials to discipline.

194. DR. LOEW has attempted to mitigate her damages by obtaining other employment and continuing to serve vulnerable populations in Santa Maria. Her subsequent work requires the handling of highly sensitive information and compliance with strict privacy and professional obligations. Her continued professional service is inconsistent with the DISTRICT's portrayal of her as dishonest, reckless, or unable to safeguard private information.

## VI. FIRST CLAIM FOR RELIEF

**First Amendment Retaliation (42 U.S.C. § 1983). Against Antonio Garcia, Kevin Platt, Dr. Krista Herrera, Salvador Reynoso, and Dr. Paul Robinson**

195. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

196. During the relevant period, Plaintiff engaged in speech and expressive activity protected by the First Amendment to the United States Constitution. Plaintiff spoke concerning matters of substantial public concern, including student access to public education, compliance with legal protections for students with disabilities, discriminatory treatment of students, student safety, governmental accountability, retaliation against employees who report misconduct, and the DISTRICT's response

to reported violations of law.

197. Plaintiff initially raised concerns through internal channels while attempting to perform her responsibilities and obtain corrective action. After those internal processes failed to provide an adequate remedy, Plaintiff also engaged in speech outside the ordinary chain of command and outside the performance of her routine job duties.

198. Among other protected acts, Plaintiff addressed the DISTRICT's governing Board during public comment on January 21, 2025, concerning student welfare, discrimination, disability protections, educational access, retaliation, administrative accountability, and the DISTRICT's response to her reports.

199. Plaintiff also communicated information concerning suspected unlawful governmental conduct to persons and audiences outside the ordinary performance of her assigned administrative duties, including through whistleblower communications undertaken after she had exhausted internal channels and had been removed from meaningful administrative responsibilities.

200. At the time of these communications, Plaintiff had already been transferred from PVHS, stripped of substantial administrative responsibilities, professionally isolated, and deprived of meaningful work. Her public and external communications therefore were not undertaken merely as part of the ordinary execution of the duties for which she had been employed.

201. Plaintiff's speech addressed matters of public concern rather than merely a private personnel grievance. The subjects of her speech included the treatment of public-school students, compliance with state and federal law, disability rights, racial discrimination, student safety, and the conduct and accountability of public officials.

202. Defendants knew of Plaintiff's protected speech. Among other things, Plaintiff addressed the governing Board publicly, submitted written complaints, communicated directly with senior DISTRICT officials, and made disclosures that were known to the individual Defendants.

203. Shortly after Plaintiff engaged in protected speech, Defendants subjected her to additional adverse actions that would chill a person of ordinary firmness from continuing to speak. These actions included, but were not limited to:

a. removing or restricting meaningful professional responsibilities;

b. involuntarily reassigning and professionally isolating Plaintiff;

c. maintaining Plaintiff in an assignment with little meaningful work;

d. placing Plaintiff on administrative leave;

e. preventing Plaintiff from communicating with DISTRICT employees or entering DISTRICT property while on leave;

f. recommending and effectuating Plaintiff's non-reelection;

g. refusing Plaintiff a meaningful opportunity to address serious accusations affecting her professional reputation;

h. issuing a stigmatizing post-employment reprimand; and

i. transmitting, adopting, or reinforcing disputed allegations in proceedings affecting Plaintiff's state-issued educational credentials.

204. The timing and sequence of events support a reasonable inference of retaliatory motive. Plaintiff was placed on administrative leave only days after her January 21, 2025 public comments and whistleblower disclosure and shortly after the outside investigator received Plaintiff's additional complaint concerning Superintendent Garcia.

205. Plaintiff is informed and believes, and on that basis alleges, that her protected speech was a substantial or motivating factor in the adverse actions taken against her.

206. Plaintiff further alleges that Defendants' stated reasons for the challenged actions were incomplete, pretextual, or developed after retaliatory action was already underway. Among other things, Defendants relied upon disputed allegations concerning confidential-information disclosures, later online postings, and alleged misconduct that had not been established through an evidentiary proceeding.

207. Plaintiff alleges that the later online postings relied upon by the DISTRICT occurred after the January 2025 closed session, administrative-leave decision, and commencement of the non-reelection process and therefore could not have supplied the contemporaneous factual basis for those earlier adverse actions.

208. Each individual Defendant named in this cause of action participated in, authorized, influenced, implemented, or ratified one or more adverse actions taken against Plaintiff with knowledge of her protected speech.

209. Defendants' retaliatory actions deprived Plaintiff of rights secured by the First and Fourteenth Amendments and are actionable under 42 U.S.C. § 1983.

210. As a direct and proximate result of Defendants' conduct, Plaintiff suffered lost earnings and benefits, diminished earning capacity, damage to her professional reputation, interruption of her administrative career and credentialing path, emotional distress, and other compensable harm.

211. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff seeks compensatory and other available damages, appropriate declaratory and equitable relief, costs, and reasonable attorney's fees.

## VII. SECOND CLAIM FOR RELIEF

**Violation of the Fourteenth Amendment Procedural Due Process § 1983. Against Yolanda Ortiz, Antonio Garcia, Kevin Platt, and Dr. Krista Herrera**

212. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

213. The Fourteenth Amendment prohibits a governmental employer from depriving a person of protected liberty interests without constitutionally adequate process.

214. A public employee possesses a protected liberty interest in her good

name, reputation, honor, and integrity when the government publicly disseminates stigmatizing accusations in connection with alteration or termination of employment status or other governmental action affecting the employee's ability to pursue her chosen profession.

215. During and after Plaintiff's employment, Defendants accused Plaintiff of serious professional misconduct, including dishonesty, unlawful disclosure of confidential student information, refusal to comply with directives, failure to cooperate, deficient professional judgment, unethical conduct, and professional unfitness.

216. These accusations were sufficiently stigmatizing to impair Plaintiff's standing in the educational profession because they directly implicated her honesty, ethics, judgment, trustworthiness, ability to protect confidential information, and fitness to serve as a credentialed educator and administrator.

217. Plaintiff expressly and contemporaneously disputed the material accusations against her. Among other things, she denied knowingly disseminating confidential student records to unauthorized persons, denied authoring or directing anonymous online postings, challenged the DISTRICT's characterization of separate documents and communications as interchangeable, and repeatedly requested the evidence supporting the accusations.

218. Defendants nevertheless acted upon and disseminated the disputed

allegations without first affording Plaintiff a meaningful evidentiary or name-clearing process.

219. The challenged accusations were made in connection with tangible governmental action against Plaintiff, including her placement on administrative leave, non-reelection, post-employment reprimand, and the transmission or reinforcement of accusations in proceedings affecting her state-issued educational credentials.

220. The DISTRICT's post-employment reprimand expressly accused Plaintiff of dishonesty, poor judgment, privacy violations, failure to follow directives, failure to cooperate, and failure to satisfy professional ethical standards.

221. The DISTRICT thereafter reported or caused the reporting of Plaintiff's separation and alleged misconduct to the California Commission on Teacher Credentialing and presented disputed allegations concerning Plaintiff's honesty, confidentiality practices, and professional judgment in a manner capable of materially impairing her ability to obtain comparable employment in education.

222. These accusations had consequences beyond ordinary criticism or internal employment evaluation. They exposed Plaintiff's educational credentials to disciplinary proceedings and impaired her ability to pursue employment in her chosen profession.

223. Before these allegations were accepted, acted upon, or transmitted in a

manner affecting Plaintiff's employment and credentials, Plaintiff was not provided a meaningful opportunity to confront the evidence against her before a neutral decision-maker.

224. Plaintiff was not permitted to compel witnesses, cross-examine adverse witnesses, examine authenticated technical evidence, challenge the DISTRICT's alleged electronic evidence, or obtain neutral credibility findings concerning the disputed accusations.

225. Plaintiff repeatedly sought an opportunity to respond to the charges affecting her employment and professional reputation, including seeking an open proceeding and restorative or neutral review. Those requests did not result in a constitutionally adequate name-clearing process.

226. Defendants also took materially inconsistent positions concerning whether charges had been made against Plaintiff and whether her alleged misconduct had been investigated. At the same time that the DISTRICT relied upon serious allegations of misconduct to justify employment and credential consequences, it asserted in related proceedings that no charges had been delivered to Plaintiff and that no investigation into her conduct had occurred.

227. Plaintiff alleges that these circumstances deprived her of a meaningful opportunity to clear her name before serious and disputed governmental accusations were used in a manner that altered her employment status and damaged her ability to

pursue her profession.

228. Defendants Ortiz, Garcia, Platt, and Herrera personally participated in, authorized, communicated, enforced, or ratified the challenged actions and did so under color of state law.

229. As a direct and proximate result of Defendants' deprivation of procedural due process, Plaintiff suffered loss of employment opportunities, diminished earning capacity, reputational injury, credential-related harm, emotional distress, and other damages.

230. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff seeks compensatory damages, appropriate declaratory and equitable relief, costs, and reasonable attorney's fees.

## VIII. THIRD CLAIM FOR RELIEF

### Violation of Labor Code § 1102.5 Whistleblower Retaliation—Against the DISTRICT

231. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

232. Labor Code § 1102.5 prohibits an employer from retaliating against an employee for disclosing information to a governmental or law-enforcement agency, to a person with authority over the employee, or to another person with authority to investigate, discover, or correct a violation or noncompliance, when the employee has

reasonable cause to believe that the information discloses a violation of state or federal statute or a violation of or noncompliance with a local, state, or federal rule or regulation.

233. Plaintiff made numerous disclosures to persons with authority over her and to persons with authority to investigate, discover, or correct violations or noncompliance.

234. Plaintiff reasonably believed that the matters she disclosed involved violations or noncompliance with state or federal law concerning, among other subjects, student access to education, protections afforded to students with disabilities, discriminatory treatment of students, student safety, lawful disciplinary practices, and retaliation for reporting governmental misconduct.

235. Plaintiff made these reports in good faith and through multiple channels, including site administrators, Human Resources personnel, cabinet-level administrators, the Superintendent, an outside investigator retained by the DISTRICT, the governing Board, and other persons to whom she reasonably believed protected disclosures could be made.

236. The DISTRICT had actual knowledge of Plaintiff's protected disclosures. Its administrators received her written complaints, participated in meetings concerning those complaints, received her public and written communications, and participated in or reviewed the investigation initiated in response to her reports.

237. After Plaintiff engaged in protected whistleblower activity, the DISTRICT subjected her to materially adverse employment actions, including but not limited to:

a. removal or reassignment of meaningful administrative responsibilities;

b. involuntary transfer from PVHS;

c. professional isolation and prolonged assignment with little meaningful work;

d. expansion or use of investigative processes against Plaintiff;

e. placement on administrative leave;

f. interruption of Plaintiff's administrative credential program and career-development opportunities;

g. Non-reelection;

h. denial of a meaningful opportunity to rebut serious allegations;

i. issuance of a post-employment reprimand;

j. transmission or reinforcement of disputed allegations in proceedings before the California Commission on Teacher Credentialing; and

k. continued reliance upon disputed allegations after Plaintiff provided contrary evidence and contemporaneous denials.

evidence.

238. Plaintiff's protected disclosures were a contributing factor in one or more of these adverse actions.

239. The causal connection is supported by, among other things, the sequence and timing of events, Defendants' knowledge of Plaintiff's disclosures, the removal of Plaintiff's duties after she began reporting concerns, her transfer and professional isolation after escalating her reports, the continuation of that isolation after the DISTRICT received notice of medically documented harm, and her placement on administrative leave within days of her January 2025 public and written whistleblower activity.

241. Plaintiff further alleges that the DISTRICT's stated reasons for the adverse actions were inconsistent, incomplete, or pretextual.

242. Among other things, the DISTRICT relied upon allegations that Plaintiff unlawfully disclosed confidential information despite DR. LOEW's contemporaneous denial, the absence of an evidentiary adjudication of those allegations, disputes concerning what documents were transmitted and accessed, and the lack of authenticated technical evidence identified to DR. LOEW connecting her to later anonymous online postings.

243. Plaintiff further alleges that online postings later relied upon by the DISTRICT occurred after significant adverse employment actions had already begun and therefore could not have been the original basis for those decisions.

244. Plaintiff alleges that the DISTRICT cannot establish by clear and convincing evidence that it would have taken the same adverse actions for legitimate,

independent reasons in the absence of Plaintiff's protected whistleblower activity.

245. As a direct and proximate result of the DISTRICT's retaliation, DR. LOEW suffered lost earnings, lost benefits, diminished earning capacity, loss of professional opportunities, reputational injury, credential-related harm, emotional distress, medical expenses, and other consequential damages.

246. Plaintiff seeks all remedies available under Labor Code §§ 1102.5 and 1102.6 and other applicable law, including damages, statutory civil penalties, reasonable attorney's fees and costs, and appropriate equitable relief.

247. WHEREFORE, Plaintiff seeks relief as set forth in the Prayer for Relief.

## IX. FOURTH CLAIM FOR RELIEF

**Retaliation under the Reporting by School Employees of Improper Governmental Activities Act "Education Code §§ 44110–44114." Against Antonio Garcia, Dr. Krista Herrera, Kevin Platt, Yolanda Ortiz, Dr. Paul Robinson, Salvador Reynoso, Santa Maria Joint Union High School DISTRICT**

248. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

249. Education Code § 44113, which is part of the Reporting by School Employees of Improper Governmental Activities Act (§§ 44110–44114), prohibits public school employees from using their official authority or influence to interfere with another person's right to make a protected disclosure.

250. Education Code Section 44113(a) provides that an employee may not directly or indirectly use or attempt to use the official authority or influence of the employee for the purpose of intimidating, threatening, coercing, commanding, or attempting to intimidate, threaten, coerce, or command any person for the purpose of interfering with the right of that person to disclose to an official agent matters within the scope of this article (Educ. Code § 44113). The statute thus specifically prohibits retaliatory conduct by a school employee who leverages their position to suppress protected disclosures.

251. As set forth above, Defendants, and each of them, violated this prohibition by retaliating against Plaintiff specifically because of her protected disclosures of violations of state and federal law. Defendants leveraged their status and influence to intimidate and coerce Plaintiff as a result of her disclosures, specifically in order to suppress her protected disclosures and to prevent her from further disclosures.

252. Defendants' violation of Education Code Section 44113 proximately caused substantial hardship and damages, including monetary damages, reputational and professional injuries, and emotional harm.

253. Plaintiff satisfied the statutory prerequisites for pursuing relief under the Reporting by School Employees of Improper Governmental Activities Act. After making protected disclosures and submitting written complaints alleging retaliation,

reprisal, and other conduct prohibited by Education Code § 44113, Plaintiff timely filed her complaint with local law enforcement on January 24, 2025, in accordance with Education Code § 44114. Plaintiff thereby complied with the statutory requirement to file a complaint with the local law enforcement agency before pursuing the civil damages remedy authorized by Education Code § 44114(c).

254. Wherefore Plaintiff seeks relief as set forth in the Prayer for Relief

## X. FIFTH CLAIM FOR RELIEF

### Violation of California Government Code § 12940(a): Discrimination (FEHA) Against the DISTRICT

255. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

256. Plaintiff is a member of protected classes under the Fair Employment and Housing Act based upon, among other characteristics alleged herein, her sex and race, ethnicity, and/or ancestry.

257. During the relevant period, Plaintiff was the only Spanish-speaking Latina administrator assigned to the leadership team at Pioneer Valley High School.

258. Plaintiff was qualified to perform her administrative position. She possessed substantial educational experience and advanced academic qualifications and initially received positive feedback concerning the quality and substance of her work.

259. Plaintiff was subjected to adverse employment actions, including removal of meaningful responsibilities, involuntary reassignment, professional isolation, administrative leave, non-reelection, and other actions affecting the terms, conditions, and privileges of her employment.

260. Plaintiff is informed and believes, and on that basis alleges, that her protected status was a substantial motivating reason for one or more of the adverse employment actions taken against her.

261. Circumstantial evidence supporting an inference of discriminatory motive includes the manner in which Plaintiff was treated in comparison with male administrators and the materially different institutional response to alleged deficiencies or misconduct.

262. As alleged above, Plaintiff reported conduct by Defendant Robinson involving student discipline, disability protections, bathroom access, racial bias, student safety, and other matters. The DISTRICT's own investigation confirmed or acknowledged material portions of the circumstances underlying Plaintiff's concerns, including that Robinson had restricted student bathroom access and had at times required correction or guidance concerning legal restrictions applicable to students with disabilities.

263. Despite those findings, the DISTRICT treated Robinson's deficiencies as matters appropriate for guidance or "coaching" rather than as evidence of

professional unfitness warranting removal from meaningful duties, prolonged professional isolation, administrative leave, stigmatizing discipline, or credential consequences.

264. By contrast, the DISTRICT treated Plaintiff's reporting, communication style, persistence, judgment, and disputed conduct as grounds for progressively more serious adverse employment actions.

265. Plaintiff was also subjected to demeaning and gender-coded treatment by Robinson, including being referred to as "Miss Jackie," a "newbie," and "just a dean," in circumstances Plaintiff alleges were intended to diminish her professional authority and standing.

266. Plaintiff further alleges that when she raised concerns related to the treatment of female students and disclosed her own perspective as a survivor of sexual abuse and assault, Robinson dismissed or failed to understand the female perspective and thereafter criticized her professional handling of the matter.

267. Plaintiff alleges that the combination of disparate treatment, gender-coded diminishment, materially different treatment of male administrators, procedural departures, and the severity of the actions directed against Plaintiff supports an inference that protected characteristics were a substantial motivating reason for at least some of the challenged employment decisions.

268. The DISTRICT's conduct violated Government Code § 12940(a).

269. As a direct and proximate result of the discrimination alleged herein, Plaintiff suffered lost wages and benefits, diminished earning capacity, reputational harm, emotional distress, loss of professional opportunities, and other damages.

270. Plaintiff seeks all damages, attorney's fees, costs, and equitable relief available under FEHA.

## XI. SIXTH CLAIM FOR RELIEF

**Violation of Government Code § 12940(h) (FEHA) (Retaliation)**

**Against the DISTRICT.**

271. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

272. California Government Code § 12940(h), which is a part of the Fair Employment and Housing Act (FEHA), prohibits employers from retaliating against employees who oppose or report unlawful employment practices. California courts have identified six elements a plaintiff must establish to prevail on a § 12940(h) retaliation claim, with the prima facie case consisting of three core showings that trigger a burden-shifting framework.

273. Section 12940(h) makes it unlawful for an employer to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under FEHA or because the person has filed a complaint, testified, or assisted in any proceeding under FEHA (Jones v. Department of

Corrections & Rehabilitation (2007) 152 Cal.App.4th 1367).

274. The elements of a retaliation claim under § 12940(h) are: (1) the employee's engagement in a protected activity; (2) retaliatory animus on the part of the employer; (3) an adverse action by the employer; (4) a causal link between the retaliatory animus and the adverse action; (5) damages; and (6) causation (Le Mere v. Los Angeles Unified School Dist., (2019) 35 Cal.App.5th 237).

275. The elements of a prima facie case under this section have been met. Plaintiff engaged protected activities which consisted of public disclosures of unlawful conduct on the part of DISTRICT staff. The DISTRICT took retaliatory action against Plaintiff in the form of

a. involuntary reassignment;

b. isolation and removal of meaningful responsibilities;

c. expansion or weaponization of the investigation;

d. placement on administrative leave;

e. interruption of the administrative credential program;

f. non-reelection;

g. denial of a meaningful opportunity to rebut the allegations;

h. post-employment reprimand;

i. referral of disputed allegations to the CTC.

276. Proximity in time between the Plaintiff's protected activities

(disclosures) and the adverse employment action usually satisfies the employee's prima facie burden to show a causal link (Castro–Ramirez v. Dependable Highway Express, Inc., 2 Cal.App.5th 1028 (2016). The close temporal relationship between Plaintiff's protected complaints and the escalation of adverse actions, together with the alleged procedural irregularities, disparate treatment, and shifting explanations for those actions, supports an inference of retaliatory motive.

277. Plaintiff's protected FEHA activity was a substantial motivating reason for one or more of the adverse actions taken against her.

278. As a direct result of the aforesaid acts of Defendants, Plaintiff has become mentally upset, anxious, distressed, and aggravated and has suffered, and will continue to suffer physical injury, sickness and pain, humiliation, embarrassment, and mental and/or emotional distress. Thereby, Plaintiff claims general damages for non-economic harm in a sum according to proof at the time of trial.

279. Plaintiff seeks all remedies available under FEHA, including compensatory damages, equitable relief, attorney's fees, and costs.

## XII. SEVENTH CLAIM FOR RELIEF

**Violation of Government Code § 12940(k) (Failure to Prevent Discrimination)**

**Against the DISTRICT**

280. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

281. Government Code § 12940(k) requires an employer to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

282. As alleged above, Plaintiff was subjected to discrimination and other unlawful treatment prohibited by FEHA.

283. The DISTRICT had actual or constructive notice of the circumstances underlying Plaintiff's complaints because Plaintiff repeatedly reported the conduct to Human Resources personnel, senior administrators, the Superintendent, and other persons with authority to investigate or correct the conduct.

284. Despite receiving such notice, the DISTRICT failed to take reasonable and effective measures to prevent further discriminatory treatment and instead permitted the conduct and adverse employment consequences alleged herein to continue.

285. Plaintiff further alleges that some of the persons to whom she reported her concerns participated in, authorized, ratified, or failed to prevent the subsequent adverse actions.

286. The DISTRICT's failure to take reasonable steps to prevent unlawful discrimination was a substantial factor in causing Plaintiff harm.

287. As a direct and proximate result, Plaintiff suffered lost earnings and benefits, diminished earning capacity, professional and reputational injury, emotional distress, and other damages.

288. Plaintiff seeks all remedies available under FEHA, including attorney's fees and costs.

## XIII. EIGHTH CLAIM FOR RELIEF

**Violation of Government Code § 12940(j) (Harassment) (FEHA). Against Dr. Paul Robinson,**

**And Other Defendants to the Extent Supported by the Evidence**

289. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

290. California Government Code § 12940(j) prohibits workplace harassment based on certain protected characteristics. A successful claimant must show that the harassing conduct was based on a protected characteristic, was sufficiently severe or pervasive, and that the employer is liable under the applicable standards.

300. Plaintiff alleges that she was subjected to demeaning and hostile conduct that was based, at least in part, upon her sex, gender, race, ethnicity, ancestry, and/or national origin.

301. Defendant Robinson repeatedly diminished Plaintiff's professional standing by referring to her in terms such as "Miss Jackie," "newbie," and "just a dean," while questioning her authority and experience.

302. Plaintiff alleges that these comments did not occur in isolation but formed part of a broader pattern of conduct in which her authority, judgment, and

professional role were repeatedly undermined.

303. Plaintiff further alleges that gender entered directly into interactions with Robinson concerning sexual misconduct and student safety. During one such discussion, Robinson expressed views about adolescent boys, girls, sex, and female self-worth that Plaintiff reasonably perceived as gender-based and inconsistent with a professional and trauma-informed approach.

304. When Plaintiff disclosed that she was a survivor of sexual abuse and assault and challenged Robinson's understanding of the female perspective, Robinson thereafter criticized Plaintiff's handling of the matter and suggested that administrators had been terminated for less.

305. Plaintiff alleges that this conduct, together with other protected-status-based diminishment and hostile treatment alleged herein, altered the conditions of her employment and contributed to an intimidating, humiliating, and hostile working environment.

306. To the extent the trier of fact determines that the conduct was sufficiently severe or pervasive, Plaintiff alleges that it constituted unlawful harassment under Government Code § 12940(j).

307. To the extent such harassment was committed by supervisors or other persons whose conduct is attributable to the DISTRICT under FEHA, the DISTRICT is liable under the applicable statutory standards.

308. As a direct and proximate result of the harassment alleged herein, Plaintiff suffered humiliation, anxiety, emotional distress, professional harm, and other damages.

## XIV. NINTH CLAIM FOR RELIEF

**Violation of Government Code § 815.2 (Intentional Infliction of Emotional Distress). Against Defendants Antonio Garcia, Kevin Platt, Dr. Krista Herrera, Yolanda Ortiz, Dr. Paul Robinson, and Feliciano Aguilar, Santa Maria Joint Union High School**

309. Plaintiff Dr. Jacqueline Loew realleges and incorporates by reference each preceding allegation of this Complaint as though fully set forth here.

310. To state a claim for intentional infliction of emotional distress, Plaintiff alleges extreme and outrageous conduct undertaken with the intent to cause emotional distress, or with reckless disregard of the probability of causing it; severe emotional distress; and actual and proximate causation.

311. Defendants Garcia, Platt, Herrera, Ortiz, Robinson, and Aguilar knowingly manufactured, adopted, and/or advanced false and damaging accusations against Plaintiff; threatened or invoked adverse credential-related consequences; denied Plaintiff a meaningful opportunity to know and respond to the accusations before they were accepted or acted upon; and continued to disseminate or rely on the false accusations after Plaintiff's employment ended. Each Defendant acted with

knowledge of, or reckless disregard for, the falsity, incompleteness, and/or unsubstantiated nature of the accusations and the substantial likelihood that the conduct would cause Plaintiff serious emotional harm.

312. In light of Defendants' positions of authority over Plaintiff, the nature and foreseeable career consequences of the accusations, the threatened credential-related harm, the denial of a meaningful evidentiary hearing or opportunity to respond, and the continued dissemination or reliance upon the accusations after Plaintiff's employment ended, Defendants' conduct was extreme and outrageous. It exceeded all bounds ordinarily tolerated in a civilized community and was not merely an insult, indignity, annoyance, or ordinary personnel dispute.

313. Defendants intended to cause Plaintiff emotional distress or acted with reckless disregard of the probability that their conduct would cause her emotional distress. Defendants knew or should have known that falsely accusing Plaintiff of serious misconduct, threatening her professional credentials, denying her a meaningful opportunity to respond, and perpetuating those accusations would cause severe emotional distress.

314. As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff suffered severe emotional distress, including substantial mental anguish, humiliation, anxiety, and emotional suffering of an enduring and substantial quality that no reasonable person should be expected to endure.

315. Defendants' conduct was a substantial factor in causing Plaintiff's severe emotional distress and resulting damages.

316. At all relevant times, Defendants Garcia, Platt, Herrera, Ortiz, Robinson, and Aguilar were employees, officers, agents, and/or authorized representatives of Defendant Santa Maria Joint Union High School DISTRICT and acted, at least in part, within the course and scope of their DISTRICT duties and authority. The DISTRICT, acting through its authorized decision-makers, ratified, adopted, approved, and/or continued the challenged conduct and its consequences without affording Plaintiff a meaningful evidentiary hearing or opportunity to respond.

317. Pursuant to California Government Code § 815.2, subdivision (a), Defendant Santa Maria Joint Union High School DISTRICT is vicariously liable for the acts and omissions of its employees acting within the scope of employment to the same extent as a private employer, subject to any applicable statutory immunity or limitation. Plaintiff seeks to hold the DISTRICT liable on that statutory vicarious-liability basis, including for its authorized ratification, adoption, and continuation of the conduct alleged above.

318. Plaintiff has been damaged in an amount to be proven at trial, including general damages for emotional distress and any other damages available under law.

## XV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment as follows:

1. Compensatory, general, special, and consequential damages according to proof, including lost wages, benefits, front pay, diminished earning capacity, medical expenses, reputational harm, and emotional distress;

2. Reinstatement or, if infeasible, front pay and equitable relief;

3. Declaratory and prospective injunctive relief under 42 U.S.C. § 1983 and the Brown Act;

4. Statutory civil penalties under Labor Code § 1102.5 and other applicable laws;

5. Prejudgment and post-judgment interest;

6. Reasonable attorney's fees under 42 U.S.C. § 1988, Labor Code § 1102.5, Government Code §§ 12965 and 54960.5, Code of Civil Procedure § 1021.5, and other applicable authorities;

7. Costs of suits; and

8. Such other legal or equitable relief as the Court deems just.

///

///

///

///

## XVI. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

DATED: August 18, 2026

LAW OFFICES OF BABAK NAFICY

/s/ Babak Naficy

______________________________

Babak Naficy (SBN 177709)
Attorney for Plaintiff
Dr. Jacqueline Loew, Ed.D.